## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LEE MORGAN Derivatively On Behalf Of TILRAY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BRENDAN KENNEDY, MICHAEL AUERBACH, REBEKAH DOPP, MARY SCOTT GREENWOOD, CHRISTINE ST. CLARE, and MARK CASTANEDA, <br><br> Defendants, <br><br> TILRAY, INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br> **VERIFIED STOCKHOLDER DECLARATORY COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Lee Morgan ("Plaintiff"), derivatively and on behalf of Tilray, Inc. ("Tilray" or the "Company"), by and through his undersigned attorneys, hereby brings this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Tilray against the Individual Defendants (defined herein) seeking to remedy their breaches of fiduciary duties from January 15, 2019 through March 2, 2020 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by Tilray with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Tilray; (c) review of news articles, stockholder communications, and postings on Tilray's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from a related securities fraud class action pending in the United States District Court Eastern District of New York

captioned, *Ganovsky v. Tilray, Inc. et al.*, No. Case 2:20-cv-01240 (the "Securities Class Action"); and (e) review of other publicly available information concerning Tilray and the defendants.

## **NATURE OF THE ACTION**

1. This is a stockholder derivative action asserting claims for breach of fiduciary duties, insider trading, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder against certain officers and members of the Company's Board of Directors (the "Board").

2. Tilray was founded in 2013 and is headquartered in Toronto, Ontario. The Company engages in the research, cultivation, processing, and distribution of medical cannabis. The Company offers its products to patients, physicians, pharmacies, governments, and hospitals, and to researchers for commercial purposes, as well as compassionate access and clinical research applications.

3. On January 15, 2019, the Company issued a press release announcing entry into a marketing and revenue sharing agreement with Authentic Brands Group LLC ("ABG"), "an owner of a portfolio of global lifestyle and entertainment brands" (the "ABG Agreement").

4. Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) the purported advantages of the ABG Agreement were significantly overstated; (ii) the underperformance of the ABG Agreement would foreseeably have a significant impact on the Company's financial results; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5. On March 2, 2020, Tilray issued a press release announcing the Company's financial results for the fourth quarter and full year 2019. Among other results, the Company

reported a net loss for the year of $321.2 million, or $3.20 per share, compared to $67.7 million, or $0.82 per share, for 2018. In addition, the Company disclosed that it "recorded non-cash charges of $112.1 million related to impairment of the Authentic Brands Group LLC ('ABG') agreement as well as $68.6 million in inventory reserves."

6.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law, Tilray has sustained damages as described below.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

8.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.  Venue is proper in this District because Tilray and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

12.     Plaintiff is a current stockholder of Tilray and has continuously held Tilray common stock at all relevant times.

13.     Defendant Tilray is incorporated in Delaware and the Company's principal executive offices are located at 1100 Maughan Road, Nanaimo, British Columbia, Canada. Tilray's common stock trades on the NASDAQ under the ticker symbol "TLRY."

14.     Defendant Brendan Kennedy ("Kennedy") has served as Tilray's President and Chief Executive Officer ("CEO") and member of the Board since January 2018. Kennedy has also served as a member of the board of directors and CEO of Tilray Canada, Ltd., the Company's Canadian subsidiary, since 2016. Kennedy served as the Executive Chairman and member of the board of directors of Privateer Holdings, Inc. ("Privateer"), a private investment firm focused exclusively on the cannabis industry, beginning in October 2011 until December 2019. Privateer was the Company's controlling stockholder until the Downstream Merger (defined below). Kennedy also served as CEO of Privateer from its founding until June 2018.  Defendant Kennedy sold the following shares with insider information regarding the ABG Agreement, which resulted in Tilray stock trading at artificially inflated prices at the time of his stock sales:

| Name | Date | Share Price | Shares Sold | Value of Shares Sold |
|------|------|-------------|-------------|----------------------|
| Brendan Kennedy | 2/13/2020 | $16.28 | 100,000 | $1,628,000.00 |
| Brendan Kennedy | 1/13/2020 | $16.40 | 100,000 | $1,640,000.00 |
| Brendan Kennedy | 12/11/2019 | $18.30 | 100,000 | $1,830,000.00 |
| Brendan Kennedy | 4/2/2019 | $63.44 | 106,109 | $6,731,554.96 |
| Brendan Kennedy | 1/24/2019 | $74.21 | 149,916 | $11,125,266.36 |
| **Total** | | | **556,025** | **$22,954,821.32** |

15.     Defendant Michael Auerbach ("Auerbach") has served as a member of the Board since February 2018. Auerbach served on the board of directors of Privateer from January 2014 to December 2019 and was a stockholder of Privateer prior to the Downstream Merger. Auerbach

served as a member of the Compensation Committee and Nominating and Corporate Governance Committee during the Relevant Period through December 12, 2019. Auerbach also served as Chairperson of the Compensation Committee and Nominating and Corporate Governance Committee during the Relevant Period through August 2019. Defendant Auerbach sold the following shares with insider information regarding the ABG Agreement, which resulted in Tilray stock trading at artificially inflated prices at the time of his stock sales:

| Name | Date | Share Price | Shares Sold | Value of Shares Sold |
|------|------|-------------|-------------|----------------------|
| Michael Auerbach | 12/2/2019 | $19.05 | 31,875 | $607,218.75 |

16.     Defendant Rebekah Dopp ("Dopp") has served as a member of the Board since May 2018. Dopp is a member of the Audit Committee and Nominating and Corporate Governance Committee. She has also served as the Chair of the Compensation Committee since August 2019. Defendant Dopp sold the following shares with insider information regarding the ABG Agreement, which resulted in Tilray stock trading at artificially inflated prices at the time of her stock sales:

| Name | Date | Share Price | Shares Sold | Value of Shares Sold |
|------|------|-------------|-------------|----------------------|
| Rebekah Dopp | 6/19/19 | $50.00 | 3,938 | $196,900.00 |

17.     Defendant Maryscott Greenwood ("Greenwood") has served as a member of the Board since May 2018. Greenwood is a member of the Audit Committee and the Compensation Committee. She is also the Chair of the Nominating and Corporate Governance Committee. Defendant Greenwood sold the following shares with insider information regarding the ABG Agreement, which resulted in Tilray stock trading at artificially inflated prices at the time of her stock sales:

| Name | Date | Share Price | Shares Sold | Value of Shares Sold |
|------|------|-------------|-------------|----------------------|
| Maryscott Scotty Greenwood | 6/19/19 | $50.01 | 667 | $33,360.00 |

18.     Defendant Christine St. Clare ("St. Clare") has served as a member of the Board since June 2018. St. Clare is Chair of the Audit Committee. She is also a member of the

Compensation Committee and the Nominating and Corporate Governance Committee. Defendant St. Clare sold the following shares with insider information regarding the ABG Agreement, which resulted in Tilray stock trading at artificially inflated prices at the time of her stock sales:

| Name | Date | Share Price | Shares Sold | Value of Shares Sold |
|------|------|-------------|-------------|----------------------|
| Christine St. Clare | 6/20/2019 | $50.01 | 4,000 | $200,040.00 |

19.     Defendant Mark Castaneda ("Castaneda") has served at all relevant times as the Chief Financial Officer ("CFO") and Treasurer of the Company. Castaneda ceased to be the CFO in March 2020. Defendant Castaneda sold the following shares with insider information regarding the ABG Agreement, which resulted in Tilray stock trading at artificially inflated prices at the time of his stock sales:

| Name | Date | Share Price | Shares Sold | Value of Shares Sold |
|------|------|-------------|-------------|----------------------|
| Mark Castaneda | 4/15/2019 | $51.72 | 10,000 | $517,200.00 |
| Mark Castaneda | 3/14/2019 | $70.43 | 30,000 | $2,112,900.00 |
| **Total** | | | **40,000** | **$2,630,100.00** |

20.     Defendants Kennedy, Dopp, Greenwood, St. Clare, and Auerbach are referred to herein as the "Director Defendants."

21.     Defendants Castaneda, Kennedy, Dopp, Greenwood, St. Clare, and Auerbach are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to

benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

23.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

24.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Tilray were required to, among other things:

      a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

> d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

> e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

25.      Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

26.      In addition, the Company has adopted a Code of Business Conduct (the "Code"). The Code states: "We are committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer and director to read and understand the Code and its application to the performance of his or her business responsibilities."

27.      The Code further states:

**Honest and Ethical Conduct**

It is the policy of TILRAY, INC. to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of TILRAY, INC. depends on the honesty, fairness and integrity brought to the job

by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

**Legal Compliance**

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer. Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as TILRAY, INC., to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

\*\*\*

**Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting**

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about TILRAY, INC. that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and Page 8 of 11 Revision Date: April 3, 2019 regulations;

- all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 12 or in accordance with the provisions of the Company's Open Door Policy on Reporting Complaints Regarding Accounting and Auditing Matters.

You are expected to deal fairly with our customers, suppliers, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors.

28.     Moreover, the Board's Audit Committee, which is and had been comprised of defendants Dopp, Greenwood, and St. Clare during the Relevant Period, had a heightened duty under the Audit Committee Charter, which states:

PURPOSE AND POLICY

The primary purpose of the Audit Committee (the "Committee") shall be to act on behalf of the Company's Board of Directors (the "Board") in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"). The operation of the Committee shall be subject to the Bylaws of the Company as in effect from time to time and Section 141 of the Delaware General Corporation Law.

The policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication among the Committee and the Auditors, the Company's financial management.

*** 

**RESPONSIBILITIES**

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The

Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

1. Evaluation and Retention of Auditors. To evaluate the performance of the Auditors, to assess their qualifications (including their internal quality- control procedures and any material issues raised by that firm's most recent internal quality-control review or any investigations by regulatory authorities) and to determine whether to retain, or to terminate, the engagement of the existing Auditors, or to appoint and engage a different independent registered public accounting firm.

2. Communication Prior to Engagement. Prior to engagement of any prospective Auditors, to review a written disclosure by the prospective Auditors of all relationships between the prospective Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and to discuss with the prospective Auditors the potential effects of such relationships on the independence of the prospective Auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence ("Rule 3526"), of the Public Company Accounting Oversight Board (United States) (the "PCAOB").

3. Approval of Audit Engagements. To determine and approve engagements of the Auditors, prior to commencement of such engagements, to perform all proposed audit, review and attest services, including the scope of and plans for the audit, the compensation to be paid, at the Company's expense, to the Auditors and the negotiation on behalf of the Company, of the Auditors' engagement letters, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

4. Approval of Non-Audit Services. To determine and approve engagements of the Auditors, prior to commencement of such engagements (unless in compliance with exceptions available under applicable laws and rules related to immaterial aggregate amounts of services), to perform any proposed permissible non-audit services, including the scope of the service and the compensation to be paid therefor, at the Company's expense, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such

preapproval decisions are presented to the full Committee at the next scheduled meeting.

5. Audit Partner Rotation. To monitor the rotation of the partners of the Auditors on the Company's audit engagement team as required by applicable laws and rules and to consider periodically and, if deemed appropriate, adopt a policy regarding rotation of auditing firms.

6. Auditor Independence. At least annually, consistent with Rule 3526, to receive and review written disclosures from the Auditors delineating all relationships between the Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence and a letter from the Auditors affirming their independence, to consider and discuss with the Auditors any potential effects of any such relationships on the independence of the Auditors as well as any compensation or services that could affect the Auditors' objectivity and independence, and to assess and otherwise take appropriate action to oversee the independence of the Auditors.

7. Former Employees of Auditors. To consider and, if deemed appropriate, adopt clear policies regarding Committee preapproval of employment by the Company of individuals employed or formerly employed by the Company's Auditors and engaged on the Company's account.

8. Audited Financial Statement Review. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the Securities and Exchange Commission and to recommend whether or not such financial statements should be so included.

9. Annual Audit Results. To review with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

10. Auditor Communications. At least annually, to discuss with the Auditors the matters required to be discussed by Auditing Standard 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

11. Quarterly Results. To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.

12. Management's Discussion and Analysis. To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission.

13. Press Releases. To review with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

14. Accounting Principles and Policies. To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements.

15. Risk Assessment and Management. To review and discuss with management and, as appropriate, the Auditors the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

16. Management Cooperation with Audit. To evaluate the cooperation received by the Auditors during their audit examination, including any significant difficulties encountered during the audit or any restrictions on the scope of their activities or access to required records, data and information and, whether or not resolved, significant disagreements with management and management's response, if any.

17. Management Letters. To review with the Auditors and, if appropriate, management, any "management" or "internal control" letter issued or, to the extent practicable, proposed to be issued by the Auditors and management's

response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

18. National Office Communications. To review with the Auditors, as appropriate, communications between the audit team and the Auditors' national office with respect to accounting or auditing issues presented by the engagement.

19. Disagreements Between Auditors and Management. To review with management and the Auditors, or any other registered public accounting firm engaged to perform review or attest services, any conflicts or disagreements between management and the Auditors, or such other accounting firm, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and to resolve any conflicts or disagreements regarding financial reporting.

20. Internal Control Over Financial Reporting. To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting including any special audit steps taken in the event of material control deficiencies.

21. Separate Sessions. Periodically, to meet in separate sessions with the Auditors, as appropriate, and management to discuss any matters that the Committee, the Auditors or management believe should be discussed privately with the Committee.

22. Correspondence with Regulators. To consider and review with management, the Auditors, outside counsel, as appropriate, and any special counsel, separate accounting firm or other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

23. Complaint Procedures. To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

24. Engagement of Registered Public Accounting Firms. To determine and approve engagements of any registered public accounting firm (in addition to the Auditors), prior to commencement of such engagements, to perform any other review or attest service, including the compensation to be paid, at the Company's expense, to such firm and the negotiation and execution, on behalf of the Company, of such firm's engagement letter, which approval may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee members, so long as any such

preapproval decisions are presented to the full Committee at the next scheduled meeting.

25. Ethical Compliance. To review the results of management's efforts to Monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, including review and oversight of related-party transactions as required by Nasdaq rules.

26. Investigations. To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

27. Proxy Report. To prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

28. Annual Charter Review. To review and assess the adequacy of this charter annually and recommend any proposed changes to the Board for approval.

29. Report to Board. To report to the Board of Directors with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

30. Insurance Coverage. The Committee shall review and establish appropriate insurance coverage for the Company's directors and executive officers.

31. Annual Committee Evaluation. To conduct an annual evaluation of the performance of the Committee.

32. General Authority. To perform such other functions and to have such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing.

It shall be the responsibility of management to prepare the Company's financial statements and periodic reports and the responsibility of the Auditors to audit those financial statements. These functions shall not be the responsibility of the Committee, nor shall it be the Committee's responsibility to ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP or otherwise comply with applicable laws.

## SUBSTANTIVE ALLEGATIONS

**BACKGROUND**

29.     The Company engages in the research, cultivation, processing, and distribution of medical cannabis. The Company offers its products to patients, physicians, pharmacies, governments, and hospitals, and to researchers for commercial purposes, as well as compassionate access and clinical research applications.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

30.     On January 15, 2019, it was announced with much fanfare that ABG, the owner of Nine West shoes and Juicy Couture makeup, and Tilray had signed the ABG Agreement for the purpose of developing cannabis-infused foot creams, cosmetics, and other consumer products.

31.     Under the ABG Agreement, Tilray agreed to pay ABG $100 million and up to $250 million in cash and stock, depending on the success of the venture, to create and distribute consumer cannabis products as the retailer's preferred supplier. The deal was also supposed to give Tilray access to a wide consumer base and massive global distribution network.

32.     The Relevant Period starts on January 15, 2019, when the Individual Defendants caused the Company to issue a press release reporting its entry into the ABG Agreement. The press release stated in relevant part:

> NANAIMO, British Columbia -- (BUSINESS WIRE) -- Today, Tilray, Inc. (NASDAQ: TLRY), a global pioneer in cannabis production and distribution, and Authentic Brands Group (ABG), an owner of a portfolio of global lifestyle and entertainment brands, announced that they have signed a long-term revenuesharing agreement to market and distribute a portfolio of consumer cannabis products within ABG's brand portfolio in jurisdictions where regulations permit.
>
> As the owner of more than 50 brands, ABG builds value by partnering with an expansive network of best-in-class manufacturers, operators and retailers. With a global retail footprint of over 100,000 points of sale and more than 4,500 branded freestanding stores and shop-in-shops, ABG's

portfolio generates approximately US$9 billion in retail sales annually. Reaching nearly 250 million social media followers across key digital platforms, ABG's robust marketing arm drives growth and engagement for its portfolio, including connecting its brands with over 150 million targeted followers through Winston, its proprietary micro-influencer network.

Under the terms of the agreement:

- The parties will leverage ABG's portfolio of brands to develop, market and distribute consumer cannabis products across the world, as and where legal, with an immediate focus on opportunities, including CBD, in Canada and the U.S. subject to applicable and brand appropriate regulations.

- Tilray will be the preferred supplier of active cannabinoid ingredients for such products.

- Tilray will initially pay to ABG US$100 million and up to US$250 million in cash and stock, subject to the achievement of certain commercial and/or regulatory milestones.

- Tilray will have the right to receive up to 49% of the net revenue from cannabis products bearing ABG brands, with a guaranteed minimum payment of up to US$10 million annually for 10 years, subject to certain commercial and/or regulatory milestones.

- Through this agreement, ABG and Tilray join forces at the intersection of science and brand to connect consumers with innovative health and wellness products suited to their many lifestyle needs.

"We are thrilled to partner with ABG, a global leader known for expertly managing and marketing an owned portfolio of iconic brands," said Brendan Kennedy, Tilray President and CEO. "As we work to expand Tilray's global presence, this agreement leverages our complementary strengths and will be accretive to our shareholders as we reach new consumers across the entertainment, fashion, beauty, home and health and wellness sectors. We look forward to working with ABG to bring unique and sought-after branded cannabis products to the marketplace." Daniel W. Dienst, ABG Executive Vice Chairman, said, "Tilray's unyielding focus on science, product quality, operational excellence and innovation has allowed them to quickly emerge as a leader in the cannabis industry. We see extraordinary potential for cannabis in the fast-growing health and wellness category – particularly for CBD products in the United States and around the world - and are excited about this long-term partnership."

33.     On March 18, 2019, the Individual Defendants caused the Company to issue a press release reporting its financial results for the full year of 2018.  The press release touted the Company's entry into the ABG Agreement, describing it as one of the Company's "Business Highlights" for the year:

> [Tilray] [a]nnounced a long-term revenue sharing agreement with Authentic Brands Group ("ABG") to leverage their portfolio of brands and develop, market and distribute consumer cannabis products across the world. This global partnership will focus on CBD products in the United States and THC/CBD products in Canada, and elsewhere as regulations permit.

34.     On March 25, 2019, the Individual Defendants caused the Company to file an Annual Report on Form 10-K with the SEC, signed by defendants Castaneda, Kennedy, Dopp, Greenwood, St. Clare, and Auerbach, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2019 10-K"). With respect to the ABG Agreement, the 2019 10-K stated:

> [Tilray] currently ha[s], and may expand the scope of, and may in the future enter into, strategic alliances with third parties that we believe will **complement or augment our existing business**. Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and **partnership with ABG**.

(Emphases added).

35.     On May 14, 2019, the Individual Defendants caused the Company to issue a press release reporting its financial results for the first quarter of 2019.  The press release touted the Company's entry into the ABG Agreement, describing it as one of the Company's "Business Highlights" for the quarter:

> [Tilray] [c]ompleted a long-term revenue sharing agreement with Authentic Brands Group (ABG) to leverage their portfolio of brands and develop, market and distribute consumer cannabis products across the world. The partnership will initially focus on CBD products in the U.S. and THC/CBD products in Canada and expand globally as regulations permit.

36.     That same day, the Company hosted an earnings call with investors and analysts during which management again touted the strength of ABG's portfolio and the purported benefits of the ABG Agreement, stating that "Our strategic partnership with Authentic Brands Group (ABG) announced in January will leverage ABG's portfolio of more than 50 of the world's most iconic brands, as well as their North American distribution network."  The Company went on to say, "With Manitoba, ***Authentic Brands Group***, and Live Well, we believe ***we are well-positioned for long-term leadership in the market***." (Emphases added).

37.     On May 15, 2019, the Individual Defendants caused the Company to file a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "Q1 2019 10-Q"). With respect to the ABG Agreement, the Q1 2019 10-Q stated in relevant part:

> [Tilray] currently ha[s], and may expand the scope of, and may in the future enter into, strategic alliances with third parties that we believe will complement or augment our existing business. Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and ***partnership with ABG***.

(Emphases added).

38.     On August 13, 2019, the Individual Defendants caused the Company to file a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "Q2 2019 10-Q"). With respect to the ABG Agreement, the Q2 2019 10-Q stated:

> [Tilray] currently ha[s], and may expand or reduce the scope of, and may in the future enter into, strategic alliances with third parties that we believe will complement or augment our existing business. Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and ***partnership with ABG***.

(Emphases added).

39.     That same day, the Company hosted an earnings call with investors and analysts during which management again touted the strength of ABG's portfolio and highlighted the purported progress of the Company's partnership with ABG, stating in relevant part:

> [Tilray's] ***strategic partnership with Authentic Brands Group which we announced in Q1 continues to build momentum*** with our first product launch planned for the second half of the year in the United States. The ABG partnership is the first of its kind deal leveraging ABG's portfolio of more than 50 of the world's more iconic brands for the global CBD market.
>
> * * *
>
> [Tilray's] strategy to capitalize on the estimated $22 billion hemp-derived CBD industry in the United States is centered on building a portfolio of trusted brands. With Manitoba Harvest as our foundation, we will continue to add to our portfolio whether it be via acquisitions such as Smith & Sinclair, ***partnerships such as Authentic Brands Group***, or by building our own brands.

(Emphases added).

40.     On November 12, 2019, the Company hosted an earnings call with investors and analysts during which management again lauded the ABG Agreement, calling it one of the Company's "pillars of growth" and an "important business driver," and stated that the strategic partnership will "expedite [the Company's] entry into the THC market when legally permitted to do so."

41.     On November 13, 2019, the Individual Defendants caused the Company to file a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "Q3 2019 10-Q"). With respect to the ABG Agreement, the Q3 2019 10-Q stated:

> [Tilray] currently ha[s], and may expand or reduce the scope of, and may in the future enter into, strategic alliances with third parties that we believe will complement or augment our existing business.  Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and ***partnership with ABG***.

(Emphases added).

42.     The statements referenced in ¶¶ 33-41 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) the purported advantages of the ABG Agreement were significantly overstated; (ii) the underperformance of the ABG Agreement would foreseeably have a significant impact on the Company's financial results; and (iii) as a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**MATERIALLY FALSE AND MISLEADING PROXY STATEMENT ISSUED BY DIRECTOR DEFENDANTS KENNEDY, DOPP, GREENWOOD, ST. CLARE, AND AUERBACH**

43.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, defendants Kennedy, Dopp, Greenwood, St. Clare, and Auerbach likewise caused the Company to issue false and misleading proxy statements.

44.     On April 15, 2019, the Director Defendants caused the Company to file with the SEC on Form DEF 14A and disseminate to stockholders a Proxy Statement (the "2019 Proxy") in connection with the Company's annual stockholder meeting to be held on May 30, 2019. The Director Defendants drafted, approved, reviewed, and/or signed the 2019 Proxy before it was filed with the SEC and disseminated to Tilray's stockholders. The Director Defendants knew or were deliberately conscious in not knowing, that the 2019 Proxy was materially false and misleading.

45.     Among other things, the 2019 Proxy sought stockholder approval for defendants Dopp and Auerbach to be re-elected as directors. The 2019 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which as explained above, includes special obligations regarding

ethical behavior, legal compliance for directors, and financial reporting such that all SEC filings are to be accurate.

46.     The Board sought a "for" vote in connection with the re-election of defendants Dopp and Auerbach.

47.     The 2019 Proxy was false and misleading because it solicited Tilray stockholder votes for the re-election of Dopp and Auerbach as directors even though the Director Defendants were aware, but had failed to disclose: (i) the purported advantages of the ABG Agreement were significantly overstated; (ii) the underperformance of the ABG Agreement would foreseeably have a significant impact on the Company's financial results; and (iii) as a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

48.     Without this information, stockholders voted to re-elect defendants Auerbach and Dopp to serve as Tilray directors.

49.     In fact, the re-election of defendant Dopp was of particular importance to Tilray stockholders since Dopp is a member of the Audit Committee and therefore had specific duties related to the Company's financial statements and the statements issued in connection therewith. Per the 2019 Proxy, "The primary purpose of the Audit Committee is to discharge the responsibilities of our Board with respect to our accounting, financial and other reporting and internal control practices and to oversee our independent registered accounting firm."

50.     Had truthful disclosures been made by the Director Defendants in connection with the 2019 Proxy, defendants Dopp and Auerbach may not have been re-elected as directors.

**THE TRUTH EMERGES**

51.     On March 2, 2020, the Individual Defendants caused the Company to issue a press release announcing the Company's financial results for the fourth quarter and full year 2019.

Among other results, the Company reported a net loss for the year of $321.2 million, or $3.20 per share, compared to $67.7 million, or $0.82 per share, for 2018. On a quarterly basis, the Company reported a net loss of $219.1 million, or $2.14 a share. Wall Street had been anticipating a loss of 40 cents per share.

52.     In addition, the Company disclosed that it "recorded non-cash charges of $112.1 million related to impairment of the Authentic Brands Group LLC ('ABG') agreement as well as $68.6 million in inventory reserves." Finally, revenue of $46.9 million missed estimates by $8.6 million.

53.     On this news, the Company's stock price fell $2.33 per share, or 15.18%, to close at $13.02 per share on March 3, 2020.

54.     A March 8, 2020 *Motley Fool* article titled "Tilray's Revenue Squeeze and Mounting Losses" discussing the ABG Agreement stated, "[This is] concerning, as it seems the company is getting little or nothing from its involvement in this deal."

55.     On March 13, 2020, Tilray was forced to price a $90.4 million stock offering at $4.76 a share.  The Company said it planned to use the cash for general corporate purposes.

## DAMAGES TO TILRAY

56.     As a result of the Individual Defendants' wrongful conduct, Tilray disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Tilray's credibility. Tilray has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

57.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Tilray to the Securities Class Action.

58.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Tilray's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein, and resulting in the Company having to raise money at a lower share price than it would have without the Individual Defendants' false and misleading statements.

59.     Moreover, these actions have irreparably damaged Tilray's corporate image and goodwill.  For at least the foreseeable future, Tilray will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Tilray's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

61.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

62.     Plaintiff is an owner of Tilray common stock and was an owner of Tilray common stock at all times relevant hereto.

63.     Plaintiff will adequately and fairly represent the Company's and its stockholders' interests in enforcing and prosecuting its rights.

64.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

65.     At the time this action was commenced, the Board consisted of the Director Defendants: Kennedy, Dopp, Greenwood, St. Clare, and Auerbach. The Director Defendants, *i.e.*, the entire Board, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons.

### DEMAND IS FUTILE AS TO DEFENDANTS KENNEDY, DOPP, GREENWOOD, ST. CLARE, AND AUERBACH BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

66.     Defendants Kennedy, Dopp, Greenwood, St. Clare, and Auerbach all face a substantial likelihood of liability for their individual misconduct. Defendants Kennedy, Dopp, Greenwood, St. Clare, and Auerbach were directors either throughout, or part of, the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

67.     Moreover, the Director Defendants, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

68.     The Director Defendants are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above. Moreover, each of these defendants signed the false and misleading 2019 10-K.

69.     In addition, the Director Defendants also caused the Company to issue the false and misleading 2019 Proxy.

70.     The Director Defendants face a substantial likelihood of liability for their conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith. If the Director Defendants were to bring a suit on behalf of Tilray to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do.

71.     Lastly, the Director Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith for engaging in illegal insider trading of Tilray securities, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

72.     For these reasons, demand is futile as to Defendants Kennedy, Dopp, Greenwood, St. Clare, and Auerbach

**DEFENDANT KENNEDY**

73.     Demand on defendant Kennedy is also futile for several reasons. Kennedy is the Company's founder and has served as the President and CEO and a member of the Board since January 2018.  Kennedy has also served as a member of the board of directors and CEO of Tilray Canada, Ltd., the Company's Canadian subsidiary, since 2016. Kennedy's principal professional occupation is his employment with the Company as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Per

the Company's Schedule 14A filed with the SEC on April 30, 2020 (the "2020 Proxy"), defendant Kennedy received compensation of $3,480,910, $31,817,459, and $375,000 for the years 2019, 2018, and 2017, respectively.   These amounts are material to him and therefore he cannot independently consider a demand against defendants Dopp, Greenwood, and St. Clare who, as Compensation Committee members, determine his compensation.

74.    Additionally, Kennedy is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEMAND IS FUTILE AS TO DEFENDANTS DOPP, GREENWOOD AND ST. CLARE BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

75.    Defendants Dopp, Greenwood, and St. Clare, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements, and allowed the Individual Defendants to repeatedly make false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Dopp, Greenwood, and St. Clare were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Dopp, Greenwood, and St. Clare, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and other financial information provided by the Company, as required by the Audit Committee Charter. For these reasons, demand is futile as to defendants Dopp, Greenwood, and St. Clare.

**DEMAND IS FUTILE AS TO DEFENDANTS KENNEDY AND AUERBACH BECAUSE THEY LACK INDEPENDENCE**

76.    Defendants Kennedy and Auerbach lack independence, rendering demand futile as to them. Privateer was Tilray's controlling stockholder until Privateer merged with a wholly owned

subsidiary of Tilray and ceased to exist (the "Downstream Merger"). Defendants Kennedy and Auerbach are affiliated with Privateer and profited from the Downstream Merger.

77.     Indeed, the 2020 Proxy admits that defendants Kennedy and Auerbach are not independent because of their affiliations with Privateer. Kennedy founded Privateer and served as the Executive Chairman and member of the board of directors of Privateer beginning in October 2011 until December 2019. Auerbach was a director of Privateer and a stockholder of Privateer before the Downstream Merger.

78.     The 2020 Proxy describes the Downstream Merger as follows:

On December 12, 2019, in accordance with the terms of the Agreement and Plan of Merger and Reorganization, dated as of September 9, 2019 (the "Merger Agreement") by and among Tilray, Privateer Holdings, Inc. ("Privateer"), Down River Merger Sub, LLC, a Delaware limited liability company and wholly owned subsidiary of Tilray ("Merger Sub"), and Michael Blue, as the Stockholder Representative, Privateer merged with and into Merger Sub (the "Merger"), with Merger Sub surviving the Merger as a wholly owned subsidiary of Tilray and Privateer ceasing to exist. The Merger is referred to in this proxy statement as the "Downstream Merger."

Subject to the terms and conditions of the Merger Agreement, at the effective time of the Merger, each share of Privateer capital stock outstanding immediately prior to the effective time of the Merger (excluding shares of Privateer's capital stock held as treasury stock and dissenters' shares) were cancelled and automatically converted solely into the right to receive the applicable portion of the merger consideration, calculated in accordance with and as set forth in an allocation certificate as described in more detail in the Merger Agreement, of an aggregate of 56,121,310 shares of Tilray Class 2 common stock and 16,666,665 shares of Tilray Class 1 common stock (inclusive of 6,565,127 shares of Tilray Class 2 common stock held in escrow to be cancelled in satisfaction of any indemnification claims by Tilray under the Merger Agreement, and otherwise for contingent release to Privateer's stockholders following a period of at least 18 months after the Merger). Pursuant to the Merger Agreement, Tilray also assumed Privateer's equity incentive plan and the stock options for Privateer's capital stock outstanding thereunder immediately prior to the Merger, with such stock options henceforth representing the right to purchase a number of shares of Tilray Class 2 common stock equal to the Option Exchange Ratio, as defined in the Merger Agreement, multiplied by the number of shares of Privateer's common stock previously represented by such options (the "Assumed Options"). The aggregate number of shares of Tilray Class 2 common stock issuable upon the exercise of the Assumed Options at the time of the Merger was 3,134,431.

Immediately after the Merger, there were approximately 83,021,590 shares of Tilray Class 2 common stock and 16,666,665 shares of Tilray Class 1 common stock outstanding. Immediately after the Merger, (i) Privateer's stockholders as of immediately prior to the effective time of the Merger owned approximately 73% of the outstanding capital stock of Tilray and approximately 89% of the voting power of Tilray and (ii) the three founders of Privateer, namely Brendan Kennedy (Tilray's Chief Executive Officer and President, as well as a member of the board of directors of Tilray), Michael Blue, and Christian Groh (collectively, the "Founders"), including affiliated individuals and entities, collectively beneficially owned approximately 31% of the outstanding capital stock of Tilray and approximately 72% of the voting power of Tilray. Mr. Kennedy, an executive officer and member of Tilray's board of directors, was the Executive Chairman, a member of the board of directors and the largest stockholder of Privateer prior to the Merger. Michael Auerbach, a member of Tilray's board of directors, was a member of the board of directors and a stockholder of Privateer prior to the Merger.

79.     Defendants Kennedy and Auerbach lack independence because of their own individual and Privateer's entwinement with the Company, which is demonstrated by the Downstream Merger.  However, the Downstream Merger is just one of the numerous related-party transactions the Company has entered into with Kennedy, Auerbach, and/or Privateer through the years, per the 2020 Proxy:

*Assignment and Assumption of Lease Agreement*

In May 2019, Tilray, Inc. entered into an Assignment and Assumption of Lease Agreement with Privateer whereby Tilray assumed the lease of real property located at 2701 Eastlake Avenue East, Seattle, Washington.  Pursuant to such lease agreement, Tilray paid Privateer $1,000,000 in May 2019, as reimbursement for the security deposit paid by Privateer on the leased property and held by the landlord. Additionally, from January 2019 to May 2019, Tilray paid to Privateer $110,117 for lease payments at such location.

*Acquisition of Smith & Sinclair Ltd.*

On July 11, 2019, Tilray acquired all issued and outstanding shares of Smith & Sinclair Ltd. ("S&S"), which crafts edible candies, cocktails and fragrances in the United Kingdom and enables Tilray to develop CBD-infused edibles for distribution in Canada, United States and Europe. The purchase consideration includes $2.4 million (£1.9 million) in cash paid on closing, 79,289 shares of Tilray's Class 2 common stock issued on closing, and contingent consideration up to $3.1 million (£2.5 million) payable in Tilray's Class 2 common stock based on revenue during two periods from January 1, 2019 to December 31, 2020, as well as

the revenue and launch of CBD product in the United States and Europe and CBD or THC product in Canada on two milestones by June 1, 2020.

On transaction close, Subversive Capital, LLC, as agent for Privateer, held 5,530 shares of S&S at a cost of $431.47 per share (£347.96 per share) and $2.4 million in aggregate (£1. 9 million) pursuant to the Subversive Capital Alliance Agreement dated May 15, 2018 between Privateer and Subversive Capital, LLC. Subversive Capital, LLC is a company controlled by Michael Auerbach, who is a member of the Tilray Board. On July 11, 2019, the Subversive Capital Alliance Agreement was terminated in connection with Tilray's acquisition of S&S and Tilray paid $2.4 million (£1.9 million) in cash to Subversive Capital, LLC for the 5,530 shares, which represented approximately 30% ownership of S&S and only the original cost basis in such shares.

### Transactions between Tilray and Ten Eleven Management LLC

*Corporate Services Agreement*

In February 2018, Tilray entered into an agreement with Privateer, pursuant to which Privateer provided Tilray with certain general administrative and corporate services on an as-requested basis. Pursuant to this agreement, Tilray paid Privateer a monthly services fee based on Tilray's proportional share of the actual costs incurred by Privateer in performing the requested services. Personnel compensation was charged at cost plus a 3.0% markup and other services provided are charged at cost. This agreement was terminated in January 2019 when Tilray entered into a new agreement with Ten Eleven Management LLC in February 2019, doing business as Privateer Management, pursuant to which Ten Eleven Management LLC provides certain general and administrative and corporate services on an as-requested basis for a monthly cost of $25,000. Ten Eleven Management LLC is owned by Michael Blue and Christian Groh. This agreement remained in effect until December 31, 2019. Effective January 1, 2020, a similar agreement was executed for a four-month term ending April 30, 2020, at a rate of $17,500 per month.

*Real Estate License Agreement*

In May 2019, Tilray entered into a Real Estate License Agreement with Ten Eleven Management, LLC.  Pursuant to the Real Estate License Agreement, Tilray granted Ten Eleven Management a license to occupy an area within the property located at 2701 Eastlake Ave East, Seattle, Washington in exchange for monthly payments. In 2019, Ten Eleven Management paid Tilray $306,760 under the Agreement.

***

***Agreement with Docklight Brands, LLC***

*License Agreements*

In February 2018, one of Tilray's wholly-owned subsidiaries entered into a brand licensing agreement with Docklight Brands, a former wholly owned subsidiary of Privateer, pursuant to which Tilray obtained exclusive rights in Canada for adult use for the following brands: Marley Natural, Irisa, Goodship, Grail, Dutchy, Wallops and Head Light. Pursuant to the brand licensing agreement, Tilray will pay to Docklight Brands royalties between 2.5% and 7.5% of the net revenue generated by the licensed products. This agreement is terminable for any reason by either party on six months' notice prior to the expiration of each automatically renewing five-year term commencing from the first five-year period that ends in February 2023. In 2019, Tilray paid Docklight an aggregate of $176,000 in royalties under this agreement.

***Agreement with DB One, LLC for Hemp Material Purchases***

On December 30, 2019, Tilray, Inc. entered into two separate Hemp Material Purchase Agreements with DB One, LLC, which is a wholly owned subsidiary of Docklight Brands, LLC. Pursuant to the first Hemp Material Purchase Agreement, Tilray, Inc. sold 25kg of Broad Spectrum Hemp Extract to DB One, LLC, for a total price of $77,500. Pursuant to the second Hemp Material Purchase Agreement, Tilray, Inc. sold 75kg of CBD Isolate to DB One, LLC, for a total price of $165,000.

***Agreements with Leafly Holdings, Inc.***

During 2019, Tilray had a series of agreements with Leafly Holdings, Inc. providing for, among other things, data licensing, advertising, marketing and display placements, custom sponsorships and other general marketing activities. Leafly Holdings, Inc. is an internet-based services and media company. During 2019, Tilray and its affiliates paid to Leafly Holdings, Inc. approximately $272,000 for such services.

In February 2018, Tilray entered into a data license agreement with a former wholly-owned subsidiary of Privateer pursuant to this agreement, Tilray received a non-exclusive, perpetual license to use data on Canadian customers' engagement of Leafly's website. This agreement was terminated in 2019.

***Agreements between Tilray and certain of its Directors and Officers***

***

*Earth Sphere LLC*

In October 2017, Privateer and Brendan Kennedy, as the sole member of Earth Sphere LLC, entered into a corporate services terms and conditions agreement and manufacturing services terms and conditions agreement. Pursuant to these

agreements, Privateer provided certain manufacturing and corporate services to support Earth Sphere's business operations. These service agreements were terminated in August 2018 by Earth Sphere and approximately $4.4 million remained payable to Privateer by Earth Sphere for services provided. In July 2019, Privateer entered into a tax coverage and liability waiver agreement with Brendan Kennedy, as the sole member of Earth Sphere. Pursuant to the tax coverage and liability waiver agreement, Privateer forgave the amount payable and agreed to pay Mr. Kennedy an amount equal to the estimated tax liability incurred as a result of the debt forgiveness. Prior to the completion of the Downstream Merger all obligations among Privateer and Mr. Kennedy were satisfied.  There is no ongoing liability between Tilray and Mr. Kennedy with respect to such arrangement, all obligations having been satisfied.

*Consulting Agreement*

In September 2016, Privateer entered into a consulting agreement with Michael Auerbach. Pursuant to the consulting agreement, which terminated in February 2019, Privateer paid Mr. Auerbach approximately $910,000 over the term of the consulting agreement. In addition, Mr. Auerbach was compensated for such services with 560,000 stock options and 355,375 warrants to purchase common stock in the former Privateer Holdings, Inc.  Prior to the Downstream Merger, all the warrants were exercised and paid for and none of the stock options were exercised.  The outstanding former Privateer Holdings, Inc. stock options were assumed by Tilray and became exercisable for 600,824 shares of Tilray, Inc. Class 2 common stock in connection with the Downstream Merger.

80.     Defendants Dopp, Greenwood, and St. Clare, as members of the Board, approved and/or allowed the Company to enter into all of the above related-party transactions, including the Downstream Merger, with Privateer, Kennedy, and/or Auerbach. These numerous related-party transactions over the years demonstrate defendants Dopp, Greenwood, and St. Clare's pattern of acquiescing to the interests of defendants Kennedy and Auerbach. Accordingly, Dopp, Greenwood, and St. Clare lack independence from Kennedy and Auerbach and are unable to commence and vigorously prosecute an action against them.[1]

---

[1] In fact, defendants Kennedy, Auerbach, and Greenwood are named as defendants in a derivative action on behalf of Tilray in connection with the Downstream Merger, captioned *Bouvier et al, v. Kennedy, et al.*, Case No. 2020-0154-KSJM pending in the Delaware Court of Chancery. The complaint alleges that Kennedy, Greenwood, and Auerbach breached their fiduciary duties as directors by approving the Downstream Merger because the Downstream Merger improperly gave Privateer (which includes Kennedy and Auerbach) hundreds of millions of dollars.

**DEMAND IS FUTILE AS TO DEFENDANT GREENWOOD BECAUSE SHE LACKS INDEPENDENCE**

81.   Defendant Greenwood is a managing partner at Crestview Strategy USA LLC ("Crestview"), a Delaware limited liability company. Tilray has a longstanding business relationship with Crestview as Crestview has provided lobbying and advisory services to Tilray for numerous years. In fact, Tilray is one of Crestview's most important clients; according to the Office of the Commissioner of Lobbying of Canada's ("OCLC") website, multiple Crestview employees have filed "registrations" to lobby on behalf of Tilray. The OCLC's website also reveals that Crestview employees have filed 38 "monthly communication reports" relating to outreach to Canadian government officials on Tilray's behalf.

82.   Moreover, Crestview has also lobbied extensively on behalf of Privateer. Similar to Tilray, OCLC's website reflects that multiple Crestview employees have filed "registrations" to lobby on behalf of Privateer. Additionally, according to the OCLC's website, Crestview employees have filed 13 "monthly communication reports" relating to outreach to Canadian government officials on Privateer's behalf.

83.   Accordingly, there is a reasonable doubt that defendant Greenwood could independently consider a demand against Kennedy and Auerbach as she has a longstanding, financial relationship with these defendants through Privateer, nor could she independently consider a demand against the other members of the Board who approved Tilray's relationship with Crestview.

84.   Because Greenwood's principal employment is at a company that has done work for, and has a business affiliation with Tilray, there is a reasonable doubt that defendant Greenwood would be able to independently consider a demand because she would not want to do

anything that would damage her relationship with the Company and the other members of the Board. For these reasons, demand as to defendant Greenwood is futile.

COUNT I

**BREACH OF FIDUCIARY DUTY AGAINST THE INDIVIDUAL DEFENDANTS**

85.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

86.    The Individual Defendants owed and owe Tilray fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Tilray the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

87.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

88.    Each of the Individual Defendants had actual or constructive knowledge that violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that:  (i) the purported advantages of the ABG Agreement were significantly overstated; (ii) the underperformance of the ABG Agreement would foreseeably have a significant impact on the Company's financial results; and (iii) as a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

89.    The Individual Defendants also caused or allowed Tilray to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding Tilray's financial condition and future financial growth.

90.    The Individual Defendants failed to supervise and to exert internal controls over, and consciously disregarded responsibilities involving, the Company.

91.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Tilray has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company

92.     Plaintiff, on behalf of Tilray, has no adequate remedy at law.

## COUNT II
### AGAINST DEFENDANTS KENNEDY, AUERBACH, ST. CLARE, CASTANEDA, DOPP, AND GREENWOOD FOR BREACH OF FIDUCIARY DUTY IN CONNECTION WITH MISAPPROPRIATION OF INFORMATION AND INSIDER STOCK SALES

93.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

94.     At the time of each of the stock sales set forth herein, defendants Kennedy, Auerbach, St. Clare, Castaneda, Dopp, and Greenwood knew, but did not disclose publicly, that the Company had insufficient internal controls and had made false and misleading statements in connection with the ABG Agreement. Defendants Kennedy, Auerbach, St. Clare, Castaneda, Dopp, and Greenwood made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

95.     At the time of their stock sales, defendants Kennedy, Auerbach, St. Clare, Castaneda, Dopp, and Greenwood knew that these insufficient internal and false and misleading statements in connection with the ABG Agreement would likely result in the artificial inflation of Tilray's stock price. Defendants Kennedy's, Auerbach's, St. Clare's, Castaneda's, Dopp's, and Greenwood's sale of Tilray common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

## COUNT II
### AGAINST DEFENDANTS KENNEDY, AUERBACH, ST. CLARE, CASTANEDA, DOPP, AND GREENWOOD FOR UNJUST ENRICHMENT

96.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

97.     Defendants Kennedy, Auerbach, St. Clare, Castaneda, Dopp, and Greenwood were unjustly enriched by their receipt of proceeds from their illegal sales of Tilray common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

98.     To remedy defendants Kennedy, Auerbach, St. Clare, Castaneda, Dopp and Greenwood's unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of Tilray common stock.

## COUNT IV
### AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATIONS OF § 14(A) OF THE EXCHANGE ACT AND SEC RULE 14a-9 PROMULGATED THEREUNDER

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

101.     The 2019 Proxy violated Section 14(a) of the Exchange Act and Rule 14a-9 because it solicited Tilray stockholder votes for, *inter alia,* director elections for defendants Dopp and Auerbach, while simultaneously misrepresenting and/or failing to disclose the truth regarding the ABG Agreement.

102.    The Director Defendants' statements in the 2019 Proxy, which clearly represented that the Board had director responsibilities and duties that were adhered to and that the Company maintained proper and effective internal controls regarding financial performance were false and misleading because the 2019 Proxy failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2019 Proxy was issued, the Director Defendants already knew of the significant problems associated with the ABG Agreement, and therefore as a result, the Company's purported financial performance (issued under the Director Defendants' direction and on their watch) was illusory.

103.    The Director Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2019 Proxy, the Director Defendants were aware of this information and of their duty to disclose this information in the 2019 Proxy.

104.    In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the 2019 Proxy were misleading.

105.    The omissions and false and misleading statements in the 2019 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the election of defendants Auerbach and Dopp as Tilray directors, especially the election of defendant Dopp since defendant Dopp is a member of the Audit Committee and therefore had specific duties related to the Company's financial statements and the statements issued in connection therewith. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering

the "total mix" of information made available in the 2019 Proxy and in other information reasonably available to stockholders.

106.    As a direct and proximate result of the dissemination of the false and/or misleading 2019 Proxy the Director Defendants used to obtain stockholder approval of and thereby elect defendants Auerbach and Dopp as directors, nominal defendant Tilray suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Tilray and that Plaintiff is a proper and adequate representative of the Company;

B.      Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

C.      Ordering defendants Kennedy, Auerbach, St. Clare, Castaneda, Dopp, and Greenwood to disgorge to the Company all proceeds derived from their sales of Tilray common stock alleged herein;

D.      Directing Tilray to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on issues so triable.

Dated: June 5, 2020                       Respectfully Submitted,

                                          **DELEEUW LAW LLC**

                                          */s/ P. Bradford deLeeuw*
                                          P. Bradford deLeeuw (#3569)
                                          1301 Walnut Green Road
                                          Wilmington, DE 19807
                                          (302) 274-2180

**OF COUNSEL**                            *Attorney for Plaintiff*

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
Marion C. Passmore
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149